JOHN W. BLODGETT & *als. versus* JACOB CHAPLIN & *als.* AND JOHN K. CHAPLIN, *Trustee.*

A person cannot be charged as trustee by reason of the conveyance to him of real estate, or any interest therein, though such conveyance be fraudulent as to creditors.

But one will be charged as trustee, if he has in his possession any goods, effects or credits of the principal defendants, held under a conveyance fraudulent as to creditors, although the principal defendant could not have maintained an action against him.

The character of the purchase of the defendants' goods by the alleged trustee may be tested by the honesty of the parties in other acts, which are a part of the same transaction.

A conveyance will not be held to be fraudulent and void as to creditors, although the motives of the vendor were fraudulent, unless the vendee had knowledge of the fraudulent intention, and assisted in carrying it into execution.

Of the evidence necessary to show that a conveyance is fraudulent and void as to creditors.

ON EXCEPTIONS to the ruling of DAVIS, J.

The alleged trustee duly made his disclosure and was charged, whereupon he filed exceptions.

The contents of the disclosure, so far as they affect the questions raised, are stated in the opinion.

*N. S. & F. J. Littlefield,* for plaintiffs.

*Howard & Strout,* for trustee.

The opinion of the Court was drawn up by

TENNEY, C. J. — This suit is against Jacob Chaplin, Caleb A. Chaplin and John P. S. Gray, a co-partnership under the name of Chaplin, Gray & Co., and John K. Chaplin is summoned as trustee, who has disclosed in the case and is charged thereon, to which adjudication exceptions are taken; and the whole matter comes before the law Court. R. S., c. 86, § 79.

In March, 1861, a short time before the service of the writ on the trustee, he held, against Jacob and Caleb A. Chaplin,

three promissory notes of hand, and another against Jacob Chaplin alone, the whole sum, with interest at that time, amounting to $1327,08.

In the disclosure of the trustee to interrogatory 22,— were you informed by either of the Chaplins that they were hard pressed for money?— the answer is, that, on the day of the sale of the stock of goods, by the co-partnership to him, Caleb A. Chaplin informed him, that money was hard, and that he could not pay him, and that they should have to secure his demands some way. At that time, on the proposal of the said Caleb, he purchased the stock of goods belonging to the partnership, estimated, without any particular examination of all the several articles, at the sum of $1500. At the same time, he took a conveyance of the store and certain land, over twelve acres, from Caleb, A. Chaplin, valued at the sum of $500. As a part of the same transaction, he purchased of Jacob and Caleb A. Chaplin a quantity of staves, cooper's shop and tools, sleigh, shooks, buffalo robes, gig and harness, valued at the sum of $227. And of Caleb A. Chaplin, a bond from one Pease, for the conveyance of a parcel of land, on the payment of certain notes therein described, valued at the sum of $100, and a mortgage, given by one Lakin to Caleb A. Chaplin, of certain real estate, at the price of $100, taking an assignment of the bond and mortgage.

The sum of $1000 of the price of the stock of goods was discharged by the same amount due upon the notes held by the trustee, before mentioned, and, for the balance, of the consideration for the transfer of the goods, as Jacob and Caleb A. Chaplin could sell only $1000 worth of the stock of goods, John P. S. Gray having an interest in them, and it not being convenient to select $1000 worth of said goods, the trustee purchased the entire stock of Jacob and Caleb A. Chaplin and John P. S. Gray, and gave his note for the sum of $500, payable in six months, to said Chaplins and Gray.

The balance of the notes held by the trustee, against Jacob and Caleb A. Chaplin, being the sum of $327,08, after deducting the sum of $1000, was paid by the consideration of the

assignment of the Pease bond, and that of the conveyance of the staves, the cooper's shop and tools, sleigh, shooks, buffalo robes, gig and harness, within the sum of eight cents. The consideration for the conveyance of the store and the land was discharged by the trustee's note of $300, payable in two years, and his note for $200, payable in three years. For the estimated value of the Lakin mortgage, he gave his note for the sum of $100, payable in one year. All the notes given by the trustee were negotiable.

All the property which Jacob Chaplin, Caleb A. Chaplin and John P. S. Gray proposed to sell to the trustee, was purchased by him, excepting some shooks in Muddy river. The trustee does not know whether his purchases embraced all the attachable property of the firm and the several members thereof, or not.

It further appears from the disclosure, that the trustee employed John P. S. Gray, one of the firm, to sell out the stock of goods, after the purchase, with the exception of a small portion, which the trustee took into his own custody.

All the property obtained by the trustee, in payment of his claim of the sum of $1327,08, and that which he purchased and for which he gave his negotiable promissory notes, amounting to the sum of $1100, equal in the whole to $2427,08, were attachable in suits of the partnership creditors against the firm, so far as we can judge from the disclosure. By the transaction, if *bona fide* and free from fraud, no part of this property was subject to attachment, at all. The goods, to the amount of the sum of $1000, belonging to the co-partnership, had been appropriated to the payment of pre-existing debts of two of the members of the firm, instead of that of the same two members, which was purchased by the trustee at the same time.

The trustee stood in the relation of cousin to Jacob and Caleb A. Chaplin, and he was a brother to the wife of the latter.

Upon the foregoing facts, we are to see if the motives of those who conveyed the property to the trustee were honest,

or otherwise. We must look at those facts by themselves, and, in connection with their intentions in the transaction, so far as such intention is disclosed by what was said by the vendors and grantors, in the several instruments made.

It is proper to remark that the trustee cannot be charged by reason of any purchase of real estate, or interest therein, but, if charged at all, it must be on account of the purchase of the stock of goods belonging to the co-partnership; but the character of that purchase may be, to some extent, tested by the honesty of the parties in other acts, which made a part of the same transaction.

Again, the motives of the vendors of the stock of goods may have been fraudulent; but to hold the trustee chargeable, he must have had knowledge of the designs of the vendors, and have aided them in carrying those designs into execution.

It has been already stated, that the trustee, on the day of the purchase, and before the purchase, was informed by Caleb A. Chaplin, that money was hard, and that he could not pay him; and that " we" should have to secure the trustee's demands some way.

John K. Chaplin subjoins to his answer to the twentieth interrogatory, which is, "I think that Caleb A. Chaplin, proposed to sell me the store," the following, "in addition to my answer to question number twenty, I recollect, that Caleb A. Chaplin proposed to sell me the Union store and twelve acres of land besides, and to assign to me the Lakin mortgage, saying that he had some debts of 'honor' to pay, and that if he turned out all his personal property he could not pay those debts of 'honor,' and he wanted me to purchase the real property, and wanted my notes for the same to raise money on, and for the sake of obtaining a settlement of my demands against them, I purchased the property, and this was done on the day I purchased the goods in the store."

The foregoing exhibits the embarrassed condition of the firm and its members, and the full disclosure of it to the trustee. He was willing to aid them in placing the personal

property of the firm in a situation where it could not be reached, as he evidently supposed, by its creditors, by direct or foreign attachment. The amount of the sum of $1000, of the goods belonging to the firm, which he could not hold by an attachment to secure his claim against individual members of it, if its creditors had vigilantly looked after and enforced their rights, was withdrawn, (if the attempt shall prove successful,) from their control by attachment, and applied to the discharge of the amount of his claim, which was not against the firm, and the residue of the value of the goods put into his negotiable promissory note, and, if negotiated *bona fide* to partnership creditors, was delaying them till the maturity of the note.

It cannot be doubted, that if the purchaser of the stock of goods was allowed to stand protected by law, that the effect would be " to delay, hinder or defraud" the creditors of the partnership " of their just and lawful actions, suits, debts, accounts, damages," &c., in the language of the statute of 13th Eliz., c. 5,— and that, under all the facts and circumstances of the case, it falls within the provisions of R. S., c. 86, § 63, that "if any alleged trustee has in his possession any goods, effects or credits of the principal defendant, which he holds under a conveyance fraudulent and void, as to the defendant's creditors, he may be adjudged trustee on account thereof, although the principal defendant could not have maintained an action against him." *Glass* v. *Nichols*, 25 Maine, 328.

*Exceptions overruled.*

APPLETON, CUTTING, MAY, GOODENOW and DAVIS, JJ., concurred.